UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

DANIELLE ANDERSON,

                                        Plaintiff,

        v.                                                      3:08-CV-850
                                                                (GJD)
COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

_____

PETER A. GORTON, ESQ., for Plaintiff
VERNON NORWOOD, Special Asst. U.S. Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

## MEMORANDUM DECISION AND ORDER

This matter has been referred to me for all further proceedings, including the entry of judgment pursuant to 28 U.S.C. § 636(c), the consent of the parties, and the order of the Honorable Norman A. Mordue, Chief United States District Judge, dated August 27, 2009. (Dkt. No. 18).

## PROCEDURAL HISTORY

Plaintiff filed an application for disability benefits on December 27, 2004. (Administrative Transcript ("T.") at 77-81).  The application was initially denied. (T. 39, 44-47).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on August 2, 2006.  (T. 533-74).  Both plaintiff and her fiance testified at the hearing.  The ALJ found that plaintiff was disabled *after* August 16, 2005, but was *not disabled* between December 11, 2003 and August 16, 2005.  (T. 16-33).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on

July 30, 2008.  (T. 7-10).  This case concerns *only* the onset date of plaintiff's

disability and whether the Commissioner's decision that plaintiff's disability began

on August 17, 2005, rather than on plaintiff's claimed onset date of December 11,

2003, is supported by substantial evidence. (Plaintiff's Brief, at 1)(Dkt. No. 14).

## CONTENTIONS

The plaintiff makes the following claims:

(1) The ALJ should have obtained evidence from a Vocational Expert (VE). (Plaintiff's Brief at 3-4)(Dkt. No. 14).

(2) The ALJ's Residual Functional Capacity (RFC) finding is not supported by substantial evidence.  (Plaintiff's Brief at 4-8).

(3) The ALJ erred by failing to consider the testimony of plaintiff's fiance. (Plaintiff's Brief at 8-9).

The defendant argues that the Commissioner's determination is supported by

substantial evidence and must be affirmed.

## FACTS

This court adopts the facts contained in the Commissioner's Brief under the

heading "Statement of Facts" on pages 2 through 8, but will highlight the following

information.

## 1.    Medical Evidence

Plaintiff has a long history of knee problems in both knees and has had several

corrective surgeries, all performed by Dr. McClure, an orthopedic surgeon who has

been treating plaintiff's knee problems for approximately twenty years. (T. 200, 259).

. (T. 188-91).  Her first surgery was in 1986, the second in 1998, and the third in

1999. (T. 200, 211, 215). Dr. McClure continued to treat plaintiff for her knee problems in 2002, 2003, and 2004 (T. 221, 226, 255-59). Dr. McClure has diagnosed plaintiff with chondromalacia patella and patellofemoral arthritis in her left knee. (T. 256-57).

Dr. McClure authored a series of reports between January and December of 2004. (T. 256-59). In a report dated January 21, 2004, Dr. McClure stated that plaintiff was suffering from a "sprain" in the right knee, with possible sublaxation of the patella. (T. 255). Dr. McClure stated that he would continue "conservative treatment" because there was no effusion, plaintiff had full motion, and she could fully bear weight. Plaintiff was pregnant at the time and wanted to hold off on getting x-rays. *Id.* Dr. McClure specifically stated that "work status [was] unchanged." *Id.*

On April 29, 2004, Dr. McClure stated his diagnosis of chondromalacia patella and recommended that she continue with exercises to strengthen and rehabilitate her knee as much as possible. (T. 256). Dr. McClure stated that plaintiff had reached maximum medical improvement, had a "partial disability," and although she was "disabled from her normal duties," she could do a sedentary job if one were available. *Id.* Dr. McClure also noted that plaintiff was working at the time. *Id.* There are three reports dated in December of 2004, one on December 8, and two that are dated December 16. (T. 257-59). The December 16 reports state that they are "revisions" of the dictation from December 8. *Id.* Although the wording in each

report is slightly different,[1] all reports conclude that plaintiff has a partial disability and could perform sedentary work. *Id.*

Plaintiff has a history of mental and emotional problems caused by a combination of depression and anxiety. (T. 342-48, 365-368, 382-93). Plaintiff was hospitalized at United Health Services Hospital ("UHSH") in Binghamton between September 19 and September 27, 2004. (T. 281-99). The discharge summary from that hospitalization states that plaintiff was suffering from depression and anxiety, and was diagnosed with a "recurrent" major depressive disorder. (T. 282). According Dr. Inna Factourovich, a treating psychiatrist at UHSH, the depressive disorder was related to the birth of her son. (T. 292-94).

After treatment with medication, plaintiff's depression improved, plaintiff denied suicidal ideas or thoughts, and she displayed good insight and judgment to her emotional problems. (T. 282). She was completely compliant with her treatment. (T. 282). After discussing the prescribed medications, Dr. Factourovich specifically stated that ***"no side effects were noted to her treatment"***. *Id*. (emphasis added). The doctor stated that plaintiff reported "real plans for her future." *Id.*

After her release from the September 2004 hospitalization, plaintiff was referred for outpatient treatment through the Broome County Health Department. (T. 300). On October 13, 2004, plaintiff was diagnosed with post-partum depression and anxiety. (T. 300-302). It was recommended that plaintiff be continued on her

---

[1] The December 8th report and the first December 16th report state that plaintiff had patellofemoral arthritis secondary to patellofemoral instability. (T. 257-58). The second December 16th report states only that plaintiff has patellofemoral arthritis. (T. 259). The differences are not material.

medication, and that she should get counseling to assist her in changing her irrational thoughts and in better coping with the stresses and challenges that she was facing at home. (T. 302).

On October 28, 2004, plaintiff was evaluated by Psychiatrist, Dr. Eric Lin of Broome County Mental Health Services. (T. 303-304).  Dr. Lin discussed plaintiff's history of depression and her September 19, 2004 hospitalization. (T. 303).  During the October 28, 2004 examination, plaintiff's affect was appropriate, and although her mood was sometimes anxious and sometimes depressed, she appeared to be "fairly stable" at the time. (T. 303).  She showed no distractability, no language deviations, and denied any paranoid delusions or hallucinations. *Id.*  Her thought processes were in touch with reality, and she was well oriented in all three spheres. *Id.*

Dr. Lin stated that plaintiff's general knowledge and intelligence was in the normal average range, she had a General Equivalency Diploma,[2] and was applying to VESID[3] for her job opportunity. (T. 303-304).  Plaintiff's recent and remote memory were intact, and her judgment and insight into her problem were fair. (T. 304).  In the October 28, 2004 report, Dr. Lin did mention that plaintiff had stopped taking

---

[2] At the ALJ hearing, plaintiff testified that she attended "regular" classes until the 9th grade. (T. 544).

[3] VESID is the Office of Vocational and Educational Services for Individuals with Disabilities.  VESID is an office of the New York State Education Department. http://www.vesid.nysed.gov.

Trazodone[4] for sleep the night before the examination because she believed that it gave her nightmares.[5] (T. 203).  Dr. Lin recommended that plaintiff discontinue the Trazodone, but stated that plaintiff wished to continue taking Lexapro. (T. 304).  Dr. Lin diagnosed anxiety and depressive disorder with significant family stress and financial problems. (T. 304).

Plaintiff's mental and emotional problems became ***drastically*** worse on August 17, 2005 when she was hospitalized for almost two weeks because of depression, anxiety, and suicidal ideation. (T. 342-48).  At that time, her diagnosis was bi-polar disorder with depression and personality disorder.  (T. 343).  Although she was discharged on August 30, 2005, she was re-admitted to UHSH on September 1, 2005 for severe psychiatric problems, including anxiety, depression, and suicidal thoughts.  (T. 352-54).  She was hospitalized until September 7, 2005 and discharged with the same diagnosis.  (T. 357).

On October 11, 2005, plaintiff was again hospitalized for her depression, anxiety, and suicidal ideation. (T. 359-61).  Plaintiff was diagnosed with bi-polar disorder, anxiety disorder, and personality disorder. (T. 359-61).  It appears that she was discharged on October 12, 2005, but was re-admitted on October 14, 2005 and hospitalized until October 20, 2005. (T. 359-61, 365-68).  On October 15, 2005, psychiatrist, Dr. Edward Major explained that after plaintiff was discharged on

---

[4] Trazodone is occasionally used for sleep, but is a medication used for the treatment of depression. http://www.drugs.com.

[5] There are no other references to side effects from medication in Dr. Lin's report. (T. 303-304).

October 12, with a recommendation to continue her medication, she went to the hospital again on October 14, complaining of depression, anxiety and suicidal ideation. (T. 363). Dr. Major diagnosed atypical depression, with some features suggestive of post-partum depression, but more prominently suggestive of post-traumatic stress disorder. (T. 368).

During the October 14, 2005 hospitalization, plaintiff received four electroconvulsive treatments (ECT), which improved her symptoms. (T. 363). The doctor recommended continuing the ECT treatment on an outpatient basis. (T. 363, 368). Plaintiff has taken numerous prescribed medications for her mental and emotional problems. (T. 395-400). In October of 2005, plaintiff complained of impaired concentration and confusion from one of her medications and vomiting and cramps when taking morphine. (T. 366). Dr. Major recommended slowly discontinuing the medications that were possibly "complicating her concentration and attention" and trying other medications instead. (T. 368).

Plaintiff has had many independent medical examinations for both her physical and mental status. She has been examined by orthopedic surgeons: Dr. Graham during 2002 and 2003 (T. 233-35, 237-38); Dr. Charles Reina in 2003 and 2004 (T. 240-43, 261); and Dr. John Cusick in 2004. (T. 244-47). These independent examiners found that plaintiff was able to return to light duty work with no bending and several other restrictions. (T. 234, 238, 241, 266).

While plaintiff's application for Social Security benefits was pending during 2006, plaintiff supplied medical records to the ALJ, showing continuing treatment by

Broome County Mental Health psychiatrists during May and June 2006 (T. 457-61);

by an orthopedic physician, Dr. Brosnan during June and July 2006 (T. 462-64); and

by Dr. Paul Dura between October and December 2006 (T. 471-76).  She also

supplied reports of several MRI examinations during November 2006. (T. 486-90).

## DISCUSSION

1.   **Disability Standard**

      To be considered disabled, a plaintiff seeking disability insurance benefits or

SSI disability benefits must establish that she is "unable to engage in any substantial

gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months ...."  42

U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that [she] is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate area
> in which he lives, or whether a specific job vacancy exists for [her], or
> whether [she] would be hired if [she] applied for work.

42 U.S.C. § 1382c(a)(3)(B).

      The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520

and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If [she] is not, the
> [Commissioner] next considers whether the claimant has a "severe
> impairment" which significantly limits [her] physical or mental ability to
> basic work activities.  If the claimant suffers such an impairment, the

third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; ... .  Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

## 2.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d

9

582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

3.   **Onset Date**

Basically, the issue in this case is whether the ALJ's determination that plaintiff's disability began on August 17, 2005 is supported by substantial evidence.

A plaintiff's onset date is the date upon which she became unable to engage in substantial gainful activity by reason of her medically determinable physical or mental impairments which have lasted or are expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A).

In determining this date, the Commissioner must consider the plaintiff's alleged onset date, plaintiff's work history, the medical evidence of record, and other evidence, including the testimony of lay witnesses. *Arroyo v. Callahan*, 973 F. Supp. 397, 399 (S.D.N.Y. 1997). The date of onset must be consistent with all available evidence. *Id.* (citing *inter alia* Social Security Ruling (SSR) 83-20, 1983 SSR LEXIS 25). Thus, this court will examine whether the ALJ's finding that plaintiff's disability began in August 2005, but not before, is supported by substantial evidence.

### 4.    **Residual Functional Capacity (RFC)**

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R § 404.1545; *see Martona v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y. 1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Verginio v. Apfel*, 1998 WL 743706 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*, 737 F. Supp. at 183.

In this case, the ALJ found that, until August 17, 2005, plaintiff had the exertional capability for sedentary work. (T. 23). In making that determination, the

11

ALJ found that, in addition to the ability to lift, carry, push, and pull the requisite amount of weight, plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. (T. 23).  The ALJ also stated that plaintiff could perform simple tasks defined by simple directions, relying on a psychiatric evaluation performed by psychologist Christine Ransom during February 2005. (T. 314-17).  Psychologist Ransom found that plaintiff's memory was intact, her intellectual function was in the average range, her concentration was good, and plaintiff was able to follow and understand simple directions.  Ms. Ransom found that plaintiff would have ***mild*** difficulty with complex tasks, and that plaintiff's major depressive disorder was ***mild and improving***.  She also found that plaintiff's prognosis was good.  (T. 314-17).

Plaintiff argues that the ALJ's RFC finding is not supported by substantial evidence because, on the exertional level, the ALJ did not take into account plaintiff's use of a cane, and on the non-exertional level, he did not consider the side effects of plaintiff's medications, and her difficulty performing activities within a schedule. (Plaintiff's Brief at 2).  There is no medical support for any of these contentions.

### A.  Cane

Plaintiff's written statements do refer to use of a cane which was noted by physicians performing independent medical examinations.  However, plaintiff's treating physician, Dr. McClure does not refer to plaintiff's use of a cane prior to August 2005. (T. 255-59).  On January 21, 2004, Dr. McClure stated that plaintiff had full motion and could "fully weightbear." (T. 255).  In one of the December 16,

2004 reports, Dr. McClure mentions a knee brace, however, that reference was in conjunction with a recommendation that plaintiff "do her exercises and wear a knee brace." (T. 258).

In Dr. John Cusick's February 2004 examination, he stated that plaintiff complained of daily pain and appeared for her appointment using a cane and elastic knee braces. (T. 245). Plaintiff told Dr. Cusick, however, that she was able to cook, clean, do laundry, and do shopping for her three children. Dr. Cusick found degenerative arthritis in plaintiff's knees, but found full use and full range of motion in plaintiff's spine and extremities.[6] (T. 244-47). Dr. Cusick commented that plaintiff "has her knee braces and her cane with her, and she is examined walking with her cane *at her preference*." (T. 246)(emphasis added). She needed no help changing, no help getting on and off the examination table, and was able to rise from a chair without difficulty. (T. 246). Dr. Cusick further found full ranges of motion and full strength, with no muscle atrophy, equal reflexes, and no joint effusion, inflammation, or instability. (T. 247). Thus, prior to August 2005, there is no indication that the use of a cane was required or that it would have affected plaintiff's RFC.

## B. Treatment Side-Effects

Plaintiff's testimony in August *2006* does refer to side-effects of her medications. (T. 554). However, plaintiff's brief appears to pick and choose various statements by plaintiff in an attempt to conclude that the ALJ should have considered

---

[6] The court notes that plaintiff was eight months pregnant at the time. (T. 245).

that the side effects affected her prior to August 17, 2005.  There is no support for plaintiff's arguments in this regard.  Plaintiff's brief refers to her hearing testimony, when she stated that after electroconvulsive therapy, she became extremely fatigued, suffered memory loss, and was required to rest every day for about two hours. (T. 550-53, 560).  The record shows that the ECT treatments were given in *October 2005* (T. 363), which is *after* the date she has been found disabled.  There is nothing in the record to support the conclusion that plaintiff had these severe restrictions on her daily activities *prior to August 17, 2005*.

Although plaintiff's counsel argues that the ALJ should have considered the side-effects from plaintiff's medications, that plaintiff mentioned in her August 2006[7] testimony, (T. 554), the medical records do not support counsel's argument. As stated above, in the medical records, plaintiff's only reference to side-effects prior to August of 2005 was a statement to Dr. Lin that Trazadone, which she used for sleeping, gave her nightmares.

The ALJ's RFC finding is quite detailed is and supported by substantial evidence in the record since plaintiff's *treating orthopedic physician* said on *many* occasions during 2004, that plaintiff was able to perform sedentary work.  This court finds no basis for the ALJ to include the use of a cane or to take into account side effects of medications which were prescribed mainly after plaintiff's lengthy

---

[7] The court also notes that the ALJ's question regarding side effects was directed at medications that plaintiff was "currently taking" at the time of the hearing in 2006. (T. 554).  It was in response to this question that plaintiff testified that Zoloft was making her tired and unable to take care of her children. The ALJ then asked about medications that plaintiff was previously taking, and she mentioned that she was allergic to some of them, and they just made her sick, hyper, and unable to take care of her children. (T. 554).

hospitalizations beginning in August 2005, the day **after** she was found disabled. Plaintiff's February 2005 psychiatric evaluation found that plaintiff had good concentration, average intellectual function, and an intact memory.  Psychologist Ransom found that plaintiff's depressive disorder was mild and improving, and plaintiff was able to function doing simple tasks. (T. 316).  Thus, the ALJ's RFC determination is supported by substantial evidence.

**5.     Witness Testimony**

The ALJ is not required to reconcile every piece of evidence in the record. *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983).  It is the ALJ's function to resolve evidentiary conflicts and to evaluate the credibility of witnesses, including the plaintiff. *Valerio v. Comm'r of Social Security*, No. 08-CV-4253, 2009 U.S. Dist. LEXIS 68634, *54 (E.D.N.Y. Aug. 6, 2009) (quoting *Aponte v. Secretary of HHS*, 728 F.2d 588, 591 (2d Cir. 1984)).

Plaintiff argues that the ALJ failed to take into account testimony by her fiance, who supported plaintiff's testimony about her disabled condition.  This testimony was given in August 2006, almost one year after the date that the ALJ found plaintiff to be disabled.  Mr. Dirig testified that had been living with plaintiff for fifteen years, and he said her changes began when their son was born around March 2004 (T. 561-66). However, he did not specify precisely when she was allegedly unable to perform any household chores.  Mr. Dirig's testimony was not specific and somewhat inconsistent when he testified that sometimes plaintiff does "a million things" and other times, she does not want to do anything. (T. 568).

Mr. Dirig's testimony, at times, was clearly exaggerated, when he states that, "I felt her heart. Her blood pressure is sky high and it just, I don't know." (T. 566). The ALJ also found that plaintiff's testimony "was not entirely credible," (T. 27), and there is support in the record for that conclusion because of plaintiff's inconsistent statements and the failure of the medical evidence to support the extent of plaintiff's claims about her disabilities. Thus, the ALJ's failure to "take into account" Mr. Dirig's testimony is supported by substantial evidence.

## 6.    Vocational Expert (VE) Testimony

When an individual's impairments and related symptoms are purely exertional, and the individual's vocational profile is listed in the regulations, then the Medical Vocational Guidelines (the Grids) are applied directly to determine whether the individual is disabled or not disabled. 20 C.F.R. §§ 404.1569a(b), 416.969a(b). It has been held that if properly applied, the result expressed in the "Grids" will fulfill the Commissioner's burden at step five of the disability evaluation, without obtaining further inquiry of a VE. *See Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)).

However, when a plaintiff is not capable of the full range of a particular exertional category of work, such as when combined exertional and nonexertional limitations exist, the "Grids" may only provide a "framework" for decision. *See Bapp v. Bowen*, 802 F.2d at 603, 605-606. However, before the nonexertional impairment or impairments will invalidate the presumptions created by the grids, those impairments must "significantly diminish" the range of work allowed by the

16

individual's exertional capabilities. *Blanda v. Astrue*, 05-CV-5723, 2008 U.S. Dist. LEXIS 45319, *45-47 (E.D.N.Y. June 9, 2008)(citations omitted).

If the non-exertional impairment or impairments do significantly diminish the individual's ability to perform a full range of the exertional category of work, then the ALJ may use a VE to satisfy the Commissioner's burden to show that the plaintiff can perform substantial gainful work at step five of the disability analysis. *Id.* at *46-47 (citing *Davis v. Massanari*, 00 Civ. 4330, 2001 U.S. Dist. LEXIS 19747 (S.D.N.Y. Nov. 29, 2001)).

In this case, plaintiff argues that the ALJ was required to use a VE because of plaintiff's additional non-exertional impairments.  Specifically, plaintiff argues that since the ALJ found that plaintiff's RFC required her to work at simple tasks, he should have obtained the testimony of  a VE to comment on those non-exertional restrictions.

Plaintiff's counsel is incorrect that plaintiff's ability to perform "simple" tasks is a restriction that would significantly diminish the range of sedentary work that plaintiff could have performed prior to August of 2005.  The ability to follow simple directions, perform simple tasks, and maintain attention and concentration are consistent with the ability to perform a full range of sedentary work. *See Alvarado v. Astrue*, 07 Civ. 1389, 2008 U.S. Dist. LEXIS 37598, *20-21 (S.D.N.Y. May 9, 2008) (individual's ability to perform simple tasks supported finding that his mental condition did ***not*** result in significant work limitations).

The Social Security Rulings specifically provide that the basic demands of

unskilled work include the ability on a sustained basis "to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15, 1985 SSR LEXIS 20, *11 (1985). In this case, Dr. Ransom's February 23, 2005 report is completely consistent with a finding that plaintiff could meet the basic demands of unskilled work at that time. Thus, the ALJ did not need to utilize a vocational expert based on these alleged "limitations."

Although there are various medical records dated in 2006 and 2007, they do not relate to plaintiff's mental condition prior to August 17, 2005. Although later evidence may sometimes disclose the severity and continuity of impairments,[8] it is quite clear in this case, that plaintiff's condition, particularly her mental condition, became significantly worse in August of 2005, resulting in multiple hospitalizations. Thus, the ALJ's determination that plaintiff's onset date was not prior to August 17, 2005 is supported by substantial evidence and must be affirmed.

**WHEREFORE,** based on the findings above, it is

**ORDERED**, that the Commissioner's determination is **AFFIRMED**, and plaintiff's complaint is **DISMISSED IN ITS ENTIRETY**, and it is further

**ORDERED**, that the Clerk enter judgment for defendant.

Dated: September 21, 2009

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge

---

[8] *Parker v. Harris*, 626 F.2d 225, 232-33 (2d Cir. 1980).